# HENTZ *vs.* THE LONG ISLAND RAILROAD COMPANY.

Where, by the terms of the charter of a railroad company, much is left to the discretion of its officers, in respect to the location and route of the road, their selection should not be disturbed, unless they have *clearly* erred.

The want of any serious resistance to the location of the road, at first; the acquiescence in it by the public for a period of fourteen years; the affirmance of it by the plaintiff and others, by accepting a mortgage upon the road, in its existing state, for moneys advanced by them to pay for its construction; and the approval of it, at a public meeting of the citizens, called for the purpose, are strong proofs of the propriety of the original location.

It is not competent for a plaintiff to add materially to the causes of action set forth in his complaint, by affidavit. He may, for the purpose of obtaining a preliminary injunction, thus fortify his original claims, but he cannot *enlarge* them, or *prefer others*.

No person can object to the location of a railroad, on the ground of damage to his property, whose title or possession do not extend back to the time when the land was taken by the company.

Hentz *v.* Long Island Railroad Company.

Merely relaying the track of a railroad, is not a taking of property, within the intent of the constitutional provision requiring a compensation to be made.

It is only continuing the use of the property, according to a previously acquired right.

Where a party whose land has been taken by a railroad company, might have insisted on receiving a compensation at the time, but neglected to do so, and forbears to assert his right, until after the road is completed, and in full operation, and when an interruption of its business would be seriously injurious, an injunction should not be granted, until all the ordinary means for obtaining an indemnity have failed.

A railroad, passing through a populous village or city, is not *per se* a nuisance.

The general charge that it is a flagrant nuisance, will not be taken into consideration, any further than as it is supported by the facts

THIS was a motion by the plaintiff to continue an injunction until the final hearing. The grounds of the application, as contained in the complaint, are set forth in the opinion of the court.

*J. M. Van Cott* and *A. J. Spooner,* for the plaintiff.

*S. L. Griffin, A. Hadden* and *J. A. Weeks,* for the defendants.

S. B. STRONG, J. The plaintiff alledges in his complaint that he has been for the last five years, and is, lawfully possessed of a lot in the village of Hempstead, in the county of Queens, bounded on the north by the middle of Fulton-street, and on the west by the middle of Main-street, comprising half an acre; on which there are a dwelling house and shop fronting on Main-street, and a barn and other out buildings on Fulton-street. That while he has been so possessed of the said premises, the defendants having previously, and in or about the year 1837, laid down and along Main-street, and upon such premises, certain timbers and iron rails, constituting their railroad track, continued them thereon, running over the same with passenger and freight cars drawn by horses, greatly to his injury, and that such cars were often suffered to stand for an unreasonable time upon his said premises. That about two years ago, and for about one year, the said track was disused, and got "into a

ruinous and shattered state," and embarrassed the travel upon the highway, causing the breaking of wagons and other vehicles, and hindering and endangering their passage to and from the premises of the plaintiff. That about the 5th of last August, the defendants took up the old timbers and rails and tore up the soil of his land, and laid down in their place other timbers and iron rails, and have at various times since "broken his close," and run upon the said rails upon and over such close with their locomotives, propelled by steam; that "by the coming of the said locomotives upon and running the same over his said close, the health and lives of his family, tenants and inmates, are prejudiced and endangered, and the value of his property lessened; that an offensive smoke has filled his dwelling house; that the same is a nuisance of the most flagrant character," and that the continuance thereof would be an irreparable injury to his said property and the enjoyment thereof; and that his tenants are likely to abandon the same. That the defendants have since such 5th of August last, run upon and over the said premises certain freight cars loaded with manure and merchandise, propelling the same by means of their steam engine and horses, often without agents to watch and conduct them, and to the danger, nuisance and inconvenience of himself and family; and that from the contiguity of his land to the depot, the locomotives frequently stop opposite to his premises, and he is thus injured more than the rest of mankind.

He therefore claims two thousand dollars damages, and prays for an order of injunction restraining the defendants during the pendency of this suit from running their locomotives or cars of any description upon or over his said premises, and that a judgment may be given him for his said damages, and for a perpetual injunction.

Upon this complaint, verified by the oath of the plaintiff, the defendants have been restrained until now from running their locomotive or cars over the part of their railway south of Fulton-street, which includes that part of it passing the plaintiff's lot; and I am now asked, upon that document and various affidavits accompanying it, to continue the injunction until final judgment

---

Hentz *v.* Long Island Railroad Company.

---

shall be rendered in the action.   I shall examine with all possible brevity the several points raised and discussed by the counsel for the respective parties on the argument, and shall consider such statements made in the affidavits produced before me as I deem material.

The plaintiff grounds his application on the allegations that the railway has been illegally located; that he has not received any compensation for that part of his land which has been taken by the company; and that the establishment is a public nuisance, peculiarly injurious to him.

The defendants claim the right to construct their road, as it is, under the act authorizing them to construct, maintain and continue a branch railroad from some convenient point on their main railroad, to some proper place or point in or near the village of Hempstead, passed on the 16th of May, 1836.   The second section of that act conferred upon them the power which they possessed in reference to their main road, under the second section of their act of incorporation, (*Laws of* 1834, *p.* 231,) to construct the road "on the most practicable route."   The company adopted the existing route throughout, and made their road upon it in 1837, and have used it, with but a brief interruption, from that time until the commencement of this suit. No objection is made to the starting point on the main road, but it is contended that the terminus in Hempstead is at an improper place, and that therefore it has been illegally assumed. Much was left by the terms of the act to the discretion of those who might manage the affairs of the company, and unless they *clearly* erred, their selection ought not to be disturbed.   If a mere difference of opinion between them and those whose immediate interests might be affected by their acts, should be allowed to annul their proceedings, but few of them could be sustained; particularly when the views of parties are so varied as they usually are relative to the proper location of a railroad.   The statute clearly gives to the defendants the right to extend their branch road *into* the village.   No *fact* is stated in the plaintiff's papers to show that there is a more appropriate place *in* the village for the terminus of the road than that which has been

selected. In any other part of it, the smoke, of which the plaintiff complains, would be equally offensive ; there would be the same danger from the fire of the engine, the same exposure of human life, and a similar obstruction to the passage through the streets. If a railroad in, or through a populous village is necessarily a nuisance, that would be a reason for excluding it altogether. But I could not decide that it is, without condemning the action of both the legislative and judicial departments of this state. Many laws have been passed authorizing the construction of railroads through cities and villages. They have been carried into operation, and have been sustained by our courts. If the railroad in question had become a nuisance through mismanagement, that would not prove the impropriety of its original location.

Whether it has been so mismanaged, or, indeed, whether it be a nuisance at all, will be considered in another part of this opinion. If, in considering this question, the opinions of those principally interested are entitled to any weight, a large majority appear to be in favor of the existing location. The plaintiff and one of his counsel and two gentlemen residing near the road, above the village, are opposed to it ; and the counsel says that he attended a public meeting in the village of Hempstead, before and in reference to the relaying of the track, where, in all the conversations on the subject, it was expressly understood and declared that the company should on no account go below Fulton-street ; it being universally understood and declared that the extension of the road beyond that street would be a nuisance. In this, however, he differs from others who were present at the same meeting. Justice Hendrickson swears that " at such meeting it was neither expressly understood or declared that the railroad company were on no account to run below Fulton-street ;" and that the object and business of the meeting were to take measures to raise the necessary funds in money to induce the company to locate a depot and relay their branch railroad track *to its present termination.* Six residents of the village, some of whom are personally known to me to be gentlemen of great respectability and worth, swear that they, together

with the counsel, to whom I have alluded, and another person, were a committee appointed by the inhabitants of the village, at a meeting held pursuant to public notice, to confer and agree with the railroad company respecting the relaying of the branch track in the said village; that the said counsel acted and performed his duties as one of such committee; and that it was expressly understood and agreed, by both the committee and the company, that the said company should relay and repair their branch track, entirely through Main-street, to the original termination of the said branch at the brook; and another resident of Hempstead swears that he stated to the said counsel that the understanding was that the railroad track was to be relaid below Fulton-street, for the accommodation of merchants and others, for freighting purposes; and that he must be aware of that understanding; to which the counsel replied; "certainly; and no reasonable man can object to it; and I think there will be no difficulty about the matter." Thirteen persons owning real estate and doing business in that part of Main-street between Fulton street and the southern termination of the branch road, depose, that according to the best of their judgment and belief, the road is and will be of, great benefit and advantage to the village; and that the street is not obstructed thereby; but that it is improved and rendered more commodious for travelers. It appears, too, from the affidavit of another resident, that the plaintiff had himself subscribed and paid thirty-five dollars towards enabling the defendants to build their depot and "relay their branch track in the village." A certificate was read on the argument, signed by thirty-five persons, describing themselves as residing and doing business on Main-street, stating that the subscribers to it believed that it would be a great benefit and advantage to that street if the track of the Long Island railroad should be relaid from the junction of Main and Fulton-streets to the brook, which is its present termination. A memorial was also read, on the argument, signed by 122 individuals, who, as is stated in an affidavit annexed to it, are residents of the village, and comprise the principal part of its adult male inhabitants, stating their belief, that the use of the track to its

Hentz v. Long Island Railroad Company.

present termination has been and will be of great convenience and advantage to the village, and expressing a hope that the commissioners of highways, to whom it is addressed, would not take measures to deprive them of such means of conveyance through the village. Many of the persons who have signed the papers which I have mentioned, expressed a wish that the loco-motive should not pass below Fulton-street; and no doubt acted upon the supposition that such a regulation would be adopted; but that does not diminish the weight of their testimony or opinions in favor of the propriety of the existing location of the terminus in the village. Taking all the evidence upon this point together, I cannot think that the company has erred in this particular.

It is also contended that the defendants exceeded their powers in constructing a part of their road on a curved line, until it formed a junction with the highway leading into Main-street, and then laying their track along the highway. When a stat-ute, or a deed, describes a line extending from one designated point to another, without any qualification, it generally calls for a straight course; but in this case there is express authority for a deviation, if it should become necessary or proper in the adoption of " the most practicable route." The word practicable, as used in the statute, had particular reference to the facility of construction; and as to that, there is nothing to show that the directors had any motive to err, or that they did in fact commit any error. Neither does it appear that the curve has created any additional expense, or imposed any serious impediment to the travel, or caused any unnecessary injury to private interests. There may have been some doubt as to the right of the company to lay their track along the highway, when the branch railroad was originally constructed. The statute of May 11th, 1835, (ch. 300,) may not have been broad enough to sanction the pro-cedure. But the act to authorize the formation of railroad cor-porations and to regulate the same, passed on the 2d of April, 1850, (§ 28, sub. 5,) expressly authorizes those institutions to construct their road along any street or highway which its route shall intersect or touch, with the restriction that the usefulness

Hentz *v.* Long Island Railroad Company.

of the street or highway shall not be unnecessarily impaired. By the 49th section of the act, the same power was conferred upon existing railroad corporations. The present track on the highway and street is identical with the old one; but the rails were relaid in 1852, and that was authorized by the act of 1850, unless the usefulness of the highway or street was, in the language of that act, "unnecessarily impaired." There is evidence to show very considerable injuries to the highway, when the old track was partially disused; but the statements made in the depositions and memorials, to which I have referred, show very clearly that since the track has been relaid, the condition of the highway, and particularly of the street in the village, has been improved, and is, indeed, better than it was previous to the adoption of either as a part of the route.

The location was originally made without objection or remonstrance from any but two persons, who for some reason preferred that the road should take an untraveled route, rather than the highway, through their lands. It remained unchanged without any further objection from any one from 1837 until 1852. It was sanctioned by some fifty-four inhabitants of Hempstead (and among others by the plaintiff) who on the 20th of November, 1839, took a mortgage upon it for moneys advanced by them to pay for its construction, amounting to $13,950, of which the plaintiff's part was $300, and is now supported by a large majority of those who are principally affected by it, so far as the views of the people have been made known to me. I am clear that the objections which have been made to the location of the road have not been sustained, but that the want of any serious resistance to it at first, the acquiescence in it for a period of fourteen years, the affirmance of it by the mortgage of the road in its existing state to the plaintiff and others for moneys advanced by them to pay for its construction, and the approval of it at a public meeting called for the purpose of deliberating and deciding upon the subject, and by a large majority of those who have made the affidavits and signed the memorials which I have mentioned, are "confirmation strong" of its propriety.

The plaintiff alledges that his land extends to the center of

Main-street, and that the company have wrongfully taken a part of it for their railroad. It appears from the diagram accompanying the plaintiff's papers, and from other documents which have been handed to me, that the track has been laid in or near the middle of the street, the rail nearest the plaintiff's dwelling house being about (and upwards of) twenty feet from the outer edge of the side walk on the same side. Whatever interest the plaintiff had in the land thus taken was therefore subject to the public right to use it as a common highway. The act of 1850 which I have quoted gave to the defendants the right to take it for their railroad, provided they restored the highway to such a state as not unnecessarily to impair its usefulness. With that condition, as the papers in the cause show, they have fully complied. That act however did not, and could not authorize the defendants to impair the plaintiff's rights without compensation. But have his private rights been impaired or taken, within the meaning of the constitutional provision securing an indemnity for the private property of individuals taken for public purposes?

It does not appear very clearly from the papers what right the plaintiff had in the property taken by the defendants. He alledges in his complaint that on or about the 2d of September, 1852, and for five years prior thereto, he was and now is lawfully *possessed* of the premises described. He does not in that claim any *title* to such premises or any part of them. But he deposes in his affidavit annexed to the order for a temporary injunction, that he owns the property in fee. It is not however competent for a plaintiff to add materially to the causes of action set forth in his complaint, by affidavit. He may for the purpose of obtaining a preliminary injunction thus fortify his original claims, but he cannot *enlarge* them or *prefer others.* If however he had directly averred in his complaint that he was seised of the land in fee, it would still be a serious obstacle in the way of his obtaining the relief for which he asks, that neither his title or possession extends back to the year 1837, when the land was originally taken by the defendants. The right set forth in the complaint, and to that any action must be confined, is limited to the five years immediately preceding the 2d of Septem-

Hentz *v.* Long Island Railroad Company.

ber, 1852. It is to be inferred from that allegation that he had no interest in the premises, prior to the year 1847. Whatever right in reference to the property was taken by the defendants belonged to the proprietor in 1837, and he alone was entitled to a compensation. If the land was subsequently conveyed to the plaintiff, as it probably was, he took it *cum onere* with the railroad upon it. He certainly cannot recover for injuries done to the property when it belonged to another. After his title accrued, the track was merely relaid. That has never been considered as taking any property, within the intent of the constitutional provision. It is continuing the use of it according to a previously acquired right. If the defendants, however, so conduct their operations on the land in question as to inflict an injury upon the plaintiff for which he is entitled to redress, he can obtain it in an ordinary action, but he is not entitled to an injunction, unless he has sufficient cause to apprehend some great and irremediable evil. Whether he has or not, in this case, will be considered under another head.

But if the plaintiff had a full title to the land in question when it was first taken, and if he would then have been entitled to any compensation from the defendants for appropriating it to a species of locomotion different from that for which it had been dedicated or acquired (concerning which it is not necessary that I should give any opinion, nor do I) there is still a serious obstacle in the way of obtaining an injunction. He could have insisted on receiving a compensation when the land was first taken, and could have prevented the company from using it until such compensation had been paid, or at any rate satisfactorily secured; but after the road had been completed and was in full operation, it would not be equitable, it would not be doing justice to the public to allow him to stop the cars until he might coerce the company to pay him an exorbitant amount, or to go through with the dilatory process of having the damages assessed pursuant to the provisions of the statute. At any rate an injunction should not be granted until all the ordinary means for obtaining indemnity had failed. It was correctly decided in the case of *Hodgkinson* v. *The Long Island Railroad Company,*

(not reported) that if the plaintiff forbear until the rails are laid, and until the time when an injunction would be seriously injurious, a motion for a preliminary restraint should be denied.

The only remaining question is whether the road where it passes the plaintiff's premises is a nuisance. I have already intimated an opinion that a railroad through a populous village, or a city, is not *per se* a nuisance. The legislature has expressly authorized various companies to lay and use their track through many of our cities and villages, and cars are now drawn by locomotives propelled by steam through Albany, Schenectady, Utica, Syracuse, Rochester, Buffalo, Poughkeepsie, Brooklyn, Jamaica, and many other cities and villages. It was held in the case of *Drake* v. *The Hudson River Railroad Company*, (7 *Barb.* 508,) that a road passing through the streets in the city of New-York, and when the cars · are drawn by steam-power into a crowded part of the city (although not to the terminus of the road) was not a nuisance. Similar decisions were made in the cases of *Hamilton* v. *The New-York and Harlem Railroad Company*, (9 *Paige*, 171;) *The Lexington and Ohio Railroad Company* v. *Applegate*, (8 *Dana*, 289,) and *Chapman* v. *The Albany and Schenectady Railroad Company*, (10 *Barb.* 360.) Is there then any thing peculiar to Main-street, or in the management of the defendants, which makes the railroad where it passes the plaintiff's house a nuisance? It is not averred in the complaint that the railroad constitutes any serious impediment to the travel, along the highway. It no where appears that the rails are badly laid down, so as to create any obstruction on the surface, and it is apparent that the street is of sufficient width for carriages to pass each other without danger or difficulty, on either side of the railway. Besides, a number of respectable inhabitants of the place deposed that the condition of the street as a passway has been considerably improved by the defendants' works upon it.

Is there any thing in the management of the road and its appendages which renders it offensive to the plaintiff, to such an extent as to justify the interposition of this court by way of restraint upon the action of the defendants? One of the causes

of complaint is that the steam locomotive passes as far south as
Fulton-street, and occasionally below it. It is apparent that
many of those who have favored the introduction of the road
into the village have acted on the supposition that the locomo-
tive was not to proceed below Fulton-street, but there is no
evidence of any definite agreement with the defendants to that
effect; and as their charter does not restrict them as to the
means of transportation on any part of their route, I am not
authorized to interfere, but must leave the matter to the good
sense of those who may be intrusted with the management of
the affairs of the company. It is manifestly for their interest
to conduct its operations in such a manner as to gratify the
reasonable wishes of that part of the community which gives to
the company an efficient support. The plaintiff complains that
about two years ago, and for about a year, the track was disused
and suffered "to go to ruin," its shattered state embarrassing
the travel upon the highway, causing the breaking of vehicles,
and hindering their passage to and from his premises. There
were no doubt serious grievances at the time, but they resulted
from the then impaired condition of the track. The cause has
since been removed, and the papers furnish us no reasons to ap-
prehend a recurrence of the same or similar evils. None of the
papers mention any serious accidents since the track has been
relaid and the locomotive has passed over it, and if there had
been any, they would no doubt have been discovered by the
plaintiff, or the learned member of the bar who has resided dur-
ing the past summer with him, who acts as one of his counsel
in this action, and has shown a laudable zeal, and made strenu-
ous exertions in behalf of his client. The plaintiff complains
also of the smoke from the locomotive, on the ground that it is
prejudicial to the health and comfort of himself and his family, and
he alledges that the establishment as now conducted is a "nui-
sance of the most flagrant character," and that the lives of his
family, tenants and inmates are endangered. The general
charge that it is a flagrant nuisance, cannot be taken into con-
sideration, any further than as it may be supported by the facts.
In this case there are none except those which I have men-

tioned. The smoke must undoubtedly be annoying to some extent, but not more disagreeable or prejudicial than what may proceed from many lawful establishments in the village, nor is the inconvenience so constant or continuous. There may be some danger to human life from the rapid passage of a railroad train, but in the opinion of many, not more than what results from the passage of ordinary carriages. Accidents to children, or to adults who are not grossly careless, from the locomotives when passing through our most populous cities, are very rare. The times of their passage are generally known, and the noise made by the movement over the rails, and the engineer's whistle, give timely notice of the approach of the train. When the usual precautions are practiced the danger is very slight, and when there is any carelessness or mismanagement the company and its officers are very properly held to a rigid accountability. It is true that there can be no satisfaction for the loss of life, nor any adequate remuneration for the deprivation of a limb, but the strong probability that the company will encounter a serious loss of property, and that a careless or notoriously incompetent conductor, or engineer, will undergo a disgraceful punishment where serious injuries are inflicted, must necessarily lead to great caution and to consequent security. The evils of which the plaintiff complains are by no means peculiar to himself. They are the necessary concomitants of this species of locomotion, whether in the city or in the country. They cannot be prevented without an entire suspension of one of the greatest improvements of modern times.

Private rights should undoubtedly be effectually guarded, but the courts cannot extend the protection of the interest of any one so far as to restrict the lawful pursuits of another. The maxim *sic uteri tuo ut non alienum lædas* is true when correctly construed. It extends to all damages for which the law gives redress, but no further. If it should be applied literally, it would deprive us to a great extent of the legitimate use of our property, and impair, if not destroy its value. A man who sets up a new store or hotel in the vicinity of an old one, or who discovers and makes a new machine which wholly supersedes a prior invention,

Hentz *v.* Long Island Railroad Company.

or who erects a new dwelling house so near that of his neighbor as to endanger it from the cinders which may escape from the chimney, or as to interrupt some fine prospect, or who plants a grove so near the boundary line of another as to shade a valuable garden, or prevent the free circulation of air around a dwelling house, inflicts an injury for which the law gives no redress, and which cannot be averted by the tribunals intrusted with its administration. So too there are some useful employments which endanger the lives of human beings which cannot and ought not to be prohibited. Lives are sometimes destroyed by an omnibus, a carman's cart, a stage or a steamboat, but so long as they are not imminently dangerous they cannot be prohibited. We cannot enjoy our private rights, nor can we avail ourselves of the many advantages resulting from modern discoveries, without encountering some risk to our lives, or our property, or to some extent endangering the lives or injuring the property of others. The questions in all such cases are, is the business a lawful one, and is the injury or danger to others by or from its legitimate pursuit inevitable? If they are, the law furnishes no remedy either by way of indemnity or prevention.

The charges against the company for alledged carelessness and mismanagement are sufficiently answered by the affidavits produced by the defendants. From those papers it appears that the freight cars have at the time designated by the plaintiff been under the management and control of a competent conductor, and that their motion was by no means rapid, nor was any one injured.

Upon the whole I am satisfied that the case presented in behalf of the plaintiff does not call for, or warrant, the interposition of this court by way of restriction upon the future action of the defendants.

The motion for an injunction must therefore be denied, and the order temporarily restraining the defendants must be vacated.

[KINGS SPECIAL TERM, November 22, 1852. *S. B. Strong*, Justice.]